IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


SHERRY ADELL RAYMOND    )
             )
v.            )   No. 3:11-0055
             )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security  )


TO: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) should be denied.


## I. INTRODUCTION

The plaintiff filed applications for SSI and DIB on April 10, 2006, alleging a disability onset date of February 28, 2006, due to depression, anxiety, back problems, fibromyalgia, herniated cervical discs, and sleep apnea. (Tr. 104-12, 130.) Her applications were denied initially and upon

reconsideration. (Tr. 71-82, 91-94.)  A hearing before Administrative Law Judge ("ALJ") James E. Craig was held on January 23, 2009. (Tr. 54-70.)  The ALJ delivered an unfavorable decision on July 8, 2009 (tr. 11-22), and the plaintiff sought review by the Appeals Council. (Tr. 6.)  On November 19, 2010, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on March 10, 1966, and was 40 years old as of February 28, 2006, her alleged onset date. (Tr. 57, 73.)  The plaintiff completed the tenth grade and has earned her GED. (Tr. 134, 359.)  She worked as an automobile detailer, insulation installer, and "instructor for mentally retarded" individuals. (Tr. 66, 120, 131.)

### A. Chronological Background: Procedural Developments and Medical Records

From October of 1998, through December of 2000, the plaintiff was provided treatment from Centerstone Mental Health Centers ("Centerstone"), and its affiliate, Harriet Cohen Center, over 40 times, during which time she complained of insomnia, mood swings, anxiety, depression, a lack of energy, and a loss of appetite, and she was diagnosed with major depressive disorder ("MDD"), recurrent, moderate; panic disorder without agoraphobia; bipolar disorder, not otherwise specified ("NOS"), adjustment disorder, and migraines.[1]  (Tr. 220-380.)  She was prescribed Prozac,

---

[1] On October 13, 2000, the plaintiff related that she had received treatment for depression and anxiety since 1990. (Tr. 223.)  The plaintiff also asserted that she had been under Centerstone's care since 1997 (Docket Entry No. 12, at 3), but there are no treatment notes from Centerstone in the record prior to October of 1998.

Trazodone,[2] Paxil,[3] Seroquel,[4] Depakote,[5] Zyprexa,[6] Klonopin,[7] Benadryl,[8] and Imipramine,[9] (*id.*) and was assigned Global Assessment of Functioning ("GAF") scores of 20,[10] 40,[11] 48, 50,[12] and 60-

---

[2] Prozac and Trazodone are antidepressants which can be used to treat panic disorder. Saunders Pharmaceutical Word Book 591, 716 (2009) ("Saunders").

[3] Paxil is prescribed for depression, panic disorder, and social anxiety disorder. Saunders at 536.

[4] Seroquel is prescribed to alleviate schizophrenia and bipolar disorder. Saunders at 639.

[5] Depakote is prescribed for treatment of seizures and bipolar disorder. Saunders at 210.

[6] Zyprexa is used to treat bipolar disorders, depression, and schizophrenia. Physicians Desk Reference 1984 (64th ed. 2010) ("PDR").

[7] Klonopin is used to treat seizure disorders and panic disorder. PDR at 2855.

[8] Benadryl is an antihistamine, decongestant, and sleep aid. Saunders at 86-87.

[9] Imipramine is an antidepressant. Saunders at 364.

[10] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score within the range of 11-20 means that the plaintiff is in "[s]ome danger of hurting [her]self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) [or] she occasionally fails to maintain minimal personal hygiene (e.g., smears feces) [or] [she has a] gross impairment in communication (e.g., largely incoherent or mute)." *Id.*

[11] A GAF score within the range of 31-40 means that the plaintiff has "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34.

[12] A GAF score within the range of 41-50 means that the plaintiff has "[s]erious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

65.[11] (Tr. 198-218, 231, 259, 265, 268-70, 273.)  Multiple Tennessee Clinically Related Group ("CRG") assessments indicated that the plaintiff's activities of daily living; interpersonal functioning; concentration, task performance, and pace; and ability to adapt to change were, at worst, moderately limited (*id.*), although the October 13, 2000, CRG noted that she had a "Severe and Persistent Mental Illness."[12] (Tr. 230.)  On April 12, 2001, the plaintiff was discharged from Centerstone for non-compliance with her treatment plan, specifically, for a "lapse in service." (Tr. 219-20.)

Between November of 2000, and August of 2006, the plaintiff presented to Robertson County Medical Group ("RCMG"), NorthCrest Medical Center ("NorthCrest"), and Vanderbilt University Medical Center ("VUMC") on multiple occasions with complaints of headaches, sleeplessness, right knee pain that was between five and ten on a ten point scale, right hand/wrist pain, abdominal pain, should pain, diffuse pain, and fatigue. (Tr. 381-549, 668-70.)  A November 9, 2000, x-ray of her right wrist revealed no abnormalities (tr. 549); a November 28, 2000, cardiopulmonary report showed that she "had chest pain on stress" (tr. 474); a January 9, 2001, x-ray of her abdomen revealed "[a]bnormal but nonspecific bowel gas pattern" (tr. 472); an August 8, 2001, ultrasound of her abdomen revealed benign follicular cysts in her right ovary (tr. 468); CT

---

[11] A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.  A GAF score within the range of 61-70 means that the plaintiff has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

[12] Persons with a "Severe and Persistent Mental Illness" are "recently severely impaired and the duration of their severe impairment totals six months or longer of the past year." (Tr. 230.)

scans of her head and sinuses conducted on August 27, 2001, April 24, 2002, and August 21, 2006, were unremarkable (tr. 525-26, 674); an August 30, 2001, x-ray of her thoracic spine showed "[m]inimal degenerative changes" and "[n]o acute skeletal abnormality (tr. 467); a September 4, 2001, MRI of her brain revealed no abnormalities (tr. 524); a May 13, 2002, CT scan of her pelvis and abdomen revealed a lesion in her right kidney but no other abnormalities (tr. 461-62); November 13, 2003, and December 10, 2003, x-rays and an MRI of her right knee showed "[s]mall knee joint effusion" but were largely unremarkable (tr. 449, 515); an April 2006, polysomnography study indicated that her sleep apnea improved when she used a C-PAP machine (tr. 485); and MRIs of her thoracic spine, lumbar spine, and cervical spine, taken on April 19, 2006, revealed "[m]ild degenerative spurring" (tr. 446, 607), "[m]inimal . . . disc bulging" (tr. 445, 609), and disc herniation that "likely" caused radiculopathy, respectively. (Tr. 444, 607.)

Between November 2001, and August of 2006, the plaintiff was diagnosed with abdominal pain (tr. 427, 429, 434-37, 456, 539), "generalized myalgias," mild neuropathy (tr. 512), mild obstructive sleep apnea (tr. 401, 447, 504), insomnia (tr. 412-13, 420 ), gastrointestinal bleeding (tr. 502), gastroesophageal reflux disease ("GERD") (tr. 384, 409), fibromyalgia (tr. 384, 394, 396, 400, 490-91), myofascial pain (tr. 403), depression (tr. 384, 411, 490-91), anxiety (tr.384, 404, 409, 412-13, 415, 420, 490-91), irritable bowel syndrome ("IBS") (tr. 423, 425, 456), sinusitis (tr. 393, 429-31, 442), temporomandibular joint ("TMJ") pain,[13] joint pain (tr. 442), neck pain (tr. 398, 405, 428), right shoulder pain (tr. 405, 409), thoracic pain (tr. 401, 406, 409, 414), right knee pain (tr. 404), headaches (tr. 384, 404-05, 426, 668-69), and asthma. (Tr. 412, 417-18.) She was

---

[13] The temporomandibular joint of the jaw connects the upper temporal bone, which is part of the cranium, to the lower jaw bone. Dorland's Illustrated Medical Dictionary 1863 (30th ed. 2003) ("Dorland's").

prescribed Mobic, Prednisone, Naproxen,[14] Ultram,[15] Darvocet,[16] Levaquin,[17] Axert, Zomig,[18] Flexeril, Skelaxin, Soma, Robaxin,[19] Allegra, Zyrtec,[20] Toprol,[21] Proventil,[22] Duraphen,[23] Lexapro, Remeron, Celexa,[24] Advair,[25] Wellbutrin,[26] Trazodone, Toradol,[27] Flextra, Ambien,[28] Prevacid,[29]

---

[14] Mobic, Prednisone, and Naproxen are nonsteroidal anti-inflammatory drugs ("NSAID") prescribed for osteoarthritis and rheumatoid arthritis. Saunders at 457, 479, 575.

[15] Ultram is a pain reliever prescribed for moderate to severe pain. Saunders at 739.

[16] Darvocet is a narcotic pain-reliever and fever-reducer. Saunders at 202.

[17] Levaquin is prescribed for sinusitis. Saunders at 402.

[18] Axert and Zomig are used to treat migraines. Saunders at 73, 780.

[19] Flexeril, Skelaxin, Soma, and Robaxin are prescribed as skeletal muscle relaxants. Saunders at 295, 619, 646, 653.

[20] Allegra and Zyrtec are prescribed to treat allergies. Saunders at 28, 782.

[21] Toprol is a beta-blocker that is used to treat chest pain, heart failure, and hypertension. Saunders at 712.

[22] Proventil is an inhaled aerosol used to treat or prevent bronchospasm. Physicians Desk Reference 3204 (64th ed. 2010) ("PDR").

[23] Duraphen is a decongestant. Saunders at 248.

[24] Lexapro, Remeron, and Celexa are prescribed to treat depression and abnormal anxiety. PDR at 1153, 2924, 3504.

[25] Advair is an inhalation aerosol used to treat COPD. Saunders at 15.

[26] Wellbutrin is an antidepressant that is also prescribed for neuropathic pain. Saunders at 762.

[27] Toradol is a NSAID used to manage moderately severe acute pain. Saunders at 713.

[28] Flextra and Ambien are sleep medications. Saunders at 37, 294.

[29] Prevacid is used to treat ulcers, erosive esophagitis, GERD, and other gastroesophageal disorders. Saunders at 578.

Decadron,[30] Lyrica,[31] Percocet,[32] and Oxycodone.[33] (Tr. 394, 396, 398, 400-01, 403, 409, 413-14, 416-17, 419-20, 423-26, 428, 430-31, 435, 440, 442, 515, 684, 668-69.)

On May 8, 2006, the plaintiff presented to Dr. Ronald T. Zellem, a neurologist, with complaints of "neck, shoulder, and arm pain and numbness." (Tr. 586, 592.) Dr. Zellem diagnosed her with a "[h]erniated disk at C4-C5 with radiculopathy." (Tr. 593.) On May 11, 2006, the plaintiff underwent a cervical myelogram which revealed "degenerative disc disease and extradural compression" and "a central disc herniation" at the C4-C5 vertebrae and "mild changes of degenerative disc disease" at the C5-6 and C6-7 levels. (Tr. 603-04.) On May 19, 2006, the plaintiff presented to Dr. Zellem and he diagnosed her with a "[h]erniated disk with radiculopathy and double crush right greater than left carpal tunnel syndrome." (Tr. 591.)

On June 29, 2006, Dr. Zellem performed anterior cervical discectomy and fusion ("ACDF") surgery on the plaintiff (tr. 610-11) and a follow-up x-ray indicated that the metallic plating used in the surgery was "in good position with satisfactory alignment." (Tr. 597.) On July 26, 2006, the plaintiff presented to Dr. Zellem and related that she was "very happy with the results" of her ACDF surgery. (Tr. 589.) Dr. Zellem noted that the plaintiff was "doing very well" and that she could "resume normal activity" and "return to any employment." *Id.*

Between May and July of 2006, the plaintiff presented to HealthSouth for physical therapy on two occasions and related that the pain in her cervical spine was a four out of ten. (Tr. 620-27.)

---

[30] Decadron is an anti-inflammatory. Saunders at 204.

[31] Lyrica is prescribed for diabetic neuropathic pain, neuralgia, and fibromyalgia. Saunders at 420.

[32] Percocet is an opioid painkiller and anti-inflammatory medication. PDR at 1121.

[33] Oxycodone is a narcotic analgesic. Saunders at 524.

Treatment notes indicate that the plaintiff had impaired muscle performance, joint mobility, motor function, range of motion, and reflex integrity "associated with spinal disorders" and she was assigned a rehabilitative home exercise program. *Id.*

On August 22, 2006, Dr. Deborah Doineau, Ed.D., a Disability Determination Services (DDS) licensed psychologist, examined the plaintiff and completed a psychological evaluation (tr. 632-38) and noted that she "was oriented to person, time, place, and situation;" did not evidence psychosis; had questionable judgment; and had difficulty concentrating. (Tr. 632-36.) The plaintiff related that she does household chores, cooks "occasionally," and shops for groceries. (Tr. 636.) Dr. Doineau diagnosed the plaintiff with major depressive disorder ("MDD"), recurrent, moderate; "[b]orderline, dependent, and histrionic personality disorder traits;" and fibromyalgia; assigned her a Global Assessment of Functioning ("GAF") score of 60; and concluded that her ability to understand and remember and to sustain concentration and persistence was mildly limited. (Tr. 636-37.)

On September 19, 2006, Dr. Cathryn Yarbrough, Ph.D., a nonexamining DDS consultative psychologist, completed a Psychiatric Review Technique Form ("PRTF") (tr. 639-52) and diagnosed the plaintiff with depressive syndrome characterized by appetite disturbance with a change in weight, sleep disturbance, decreased energy, and difficulty with concentrating or thinking; with personality disorder traits; and with a substance addiction disorder. (Tr. 642, 646-47.) She concluded that the plaintiff had mild restriction of activities of daily living; mild difficulty in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation. (Tr. 649.) Dr. Yarbrough noted that the plaintiff's "[a]llegations are partially

credibly" and that although her reported activities of daily living indicate that she has "significant difficulties," her "actual demonstrated functioning . . . is no more than mildly limited." (Tr. 651.)

On September 22, 2006, Dr. James Lester, a nonexamining DDS consultant, completed a physical Residual Functional Capacity ("RFC") assessment (tr. 653-60) and found that the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 654.) He opined that in an eight hour workday the plaintiff could stand/walk and sit about six hours and that her ability to push/pull was unlimited. *Id.* Dr. Lester supported his findings by noting that there was no "MER [medical evidence in the record ]" of trigger point injections, of "OSA [obstructive sleep apnea]," of "neuropathy related to the CS [cervical spine]," or FMG [fibromyalgia] or functional restrictions because of FMG." (Tr. 654-55.)

On October 12, 2006, the plaintiff presented to RCMG with complaints of spine pain and she was diagnosed with fibromyalgia and prescribed Lyrica and Flexeril. (Tr. 667.) She returned to RCMG on January 23, 2007, with complaints of fibromyalgia and she was diagnosed with fibromyalgia, anxiety, and depression. (Tr. 760.) Based on the plaintiff's complaints of persistent pain after the June 2006, fusion, she was referred to NorthCrest for MRIs. On January 24, 2007, MRIs showed "some degenerative change at the adjacent disk level" in her cervical spine and "mild loss of height of . . . T8 and T9" in her thoracic spine,[34] but the MRI of her lumbosacral spine was normal. (Tr. 768-70.) During three visits to RCMG, from January through July of 2007, the plaintiff continued to complain of pain associated with fibromyalgia. (Tr. 757-60.)

_____

[34] The radiologist opined that the "mild loss of height" at T8 and T9 was reflected in a previous x-ray taken on June 5, 2006, but that "the mild compression" might have developed since that time.

9

On January 26, 2007, Dr. William Downey, a nonexamining DDS consultant, completed a physical RFC assessment (tr. 685-92) and found that the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 686.)  He opined that in an eight hour workday the plaintiff could stand/walk and sit about six hours and that her ability to push/pull was unlimited. *Id.* Dr. Downey noted that the plaintiff's alleged complaints of pain were not credible (tr. 690) and that the medical evidence in the record was "insufficient to accurately assess [her] alleged physical impairments." (Tr. 692.)

On January 31, 2007, the plaintiff presented to NorthCrest with complaints of headaches, she was diagnosed with migraine headaches, and she was prescribed Demerol[35] and Phenergan.[36] (Tr. 743-49.)  In March of 2007, the plaintiff presented to RCMG with complaints of fibromyalgia and she was diagnosed with fibromyalgia, depression, anxiety, and insomnia. (Tr. 759.)  In May of 2007, she presented to the emergency room at NorthCrest with complaints of rib pain and she was diagnosed with "[u]nusual soft tissue density in the left superclavicular region as well as some questionable increased markings in the lungs." (Tr. 735-41, 767.)  She also returned to RCMG in May of 2007, with complaints of fibromyalgia and was diagnosed with fibromyalgia and depression. (Tr. 758.)

In June of 2007, the plaintiff returned to NorthCrest with complaints of gastrointestinal ("GI") bleeding. (Tr. 730-34.)  She was diagnosed with GI bleeding but a colonoscopy was "[n]ormal." (Tr. 730.)  She also had an esophagram that revealed a "[m]ild extrinsic impression" on her cervical esophagus from previous spine surgery, but there were no abnormalities identified and

---

[35] Demerol is a narcotic analgesic. Saunders at 208.

[36] Phenergan is an antihistamine and a decongestant. Saunders at 551.

no evidence of GERD. (Tr. 764.)  The plaintiff returned to RCMG in October and November of 2007, but the treatment notes from those two visits are illegible. (Tr. 755-56.)

On March 31, 2008, the plaintiff presented to NorthCrest with complaints of rib pain and an x-ray of her ribs revealed "no definite rib injury" and she was prescribed Vicodin.[37] (Tr. 722-25.) On July 8, 2008, the plaintiff presented to Dr. Victor Byrd, a rheumatologist, with complaints of fibromyalgia (tr. 696-701) and related that she had "widespread pain, hurts all over, [and that her] muscles [were] sore and weak" and that she had trouble with household chores and activities of daily living. (Tr. 697.)  Dr. Byrd opined that the plaintiff "does have some myofascial pain [] but it is a bit scattered and has more myofascial spasm," that she had a "moderately depressed affect" (tr. 699), and that she "certainly could have some component of fibromyalgia," but that he also was "considering whether she has some underlying degenerative disk disease or perhaps even a mild inflammatory disorder such as Sjogren's syndrome . . . ." (Tr. 696.)  X-rays of the plaintiff's lumbar spine revealed "[n]o fracture or subluxation injury" and that the sacroiliac joint was intact. (Tr. 701.)

In August and November of 2008, the plaintiff presented to NorthCrest on two occasions with complaints of migraine headaches, nausea, and blurred vision, and she related that her pain was an eight out of ten. (Tr. 705-19.)  A CT scan of her head revealed "[n]o evidence of acute intracranial abnormality" (tr. 721), she was diagnosed with migraine headaches and prescribed Demerol, Phenergan, and Mepergan.[38] (Tr. 705-19.)

---

[37] Vicodin is a narcotic analgesic. Saunders at 753.

[38] Mepergan is a narcotic analgesic. Saunders at 437.

Between September and December of 2008, the plaintiff presented to RCMG on three occasions with complaints of shoulder pain, rib pain, fibromyalgia, anxiety, depression, and nausea. (Tr. 752-54.) She was diagnosed with anxiety, left shoulder pain, right rib pain, fibromyalgia, depression, and anxiety, and she was prescribed Ibuprofen, Lidoderm,[39] Ultram, Lyrica, and Lexapro. *Id.*

On January 12, 2009, the plaintiff was involuntarily admitted from the NorthCrest emergency room to the acute stress disorders unit of the Skyline Medical Center ("Skyline") "due to severe depression and increased stress," and she was examined by Dr. George Mathews.[40] (Tr. 774.) Dr. Mathews noted that the plaintiff "complained of muscle cramps and could not sit through the interview, preferring instead to stand and stretch" (tr. 776) and that she had anhedonia, feelings of hopelessness and helplessness, "fleeting suicidal ideation," fair concentration, "appeared [a] little dramatic at times," and "had been without medication." (Tr. 773, 776-77.) Dr. Mathews diagnosed the plaintiff with MDD, recurrent, severe without psychotic features, and chronic pain; noted that she had a history of fibromyalgia and "[s]evere psychosocial stressors;" and assigned her a GAF

---

[39] Lidoderm is a transdermal patch or anesthetic prescribed for post-herpetic neuralgia. Saunders at 407.

[40] Upon her admission, the plaintiff reported that she had been treated for depression at Baptist Hospital when she was in her 20's, and that she has one been admitted to Middle Tennessee Mental Health Institute ("MTMHI").

score of 31.[41] (Tr. 777.)  She was prescribed Celexa, Vistaril,[42] Doxepin,[43] Toradol, and BuSpar,[44] and her condition stabilized and she was discharged after four days. (Tr. 773-74.)

On January 21, 2009, Mary Anne Severino, MSW, a social worker, completed a mental Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") (tr. 778-80) and concluded that the plaintiff's ability to understand, remember and carry out simple and complex instructions; to make judgments on simple and complex work-related decisions; to interact appropriately with the public, supervisors, and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting was markedly limited. (Tr. 778-79.) Ms. Severino supported her findings by referencing the plaintiff's treatment notes from Skyline and by noting that the plaintiff was diagnosed with fibromyalgia and depression, that she was "excessively anxious," that her memory lapses limited her functioning, and that she was easily aggravated and moody. (Tr. 778-79.)

---

[41] Upon evaluation at the time of admission, Dr. Mathews assessed the plaintiff with a GAF score of 31. (Tr. 777.)  However, the discharge summary reflects a GAF score of 31 on admission and 30 on discharge (tr. 773), which would indicate that her condition worsened during her hospitalization.  A GAF score within the range of 21-30 means that the plaintiff's "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) [or] inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends." DSM-IV-TR at 34.

[42] Vistaril is prescribed to treat allergies and minor anxiety. Saunders at 758.

[43] Doxepin is an anti-depressant. Saunders at 241.

[44] BuSpar is prescribed to treat anxiety. Saunders at 116.

**B. Hearing Testimony**

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Dr. Gary Sturgill, a vocational expert ("VE"), testified. (Tr. 56-69.)  The plaintiff testified that she had neck surgery in July of 2006 (tr. 57), and that she was not able to return to work because of back and muscle pain and muscle spasms, which were triggered by "[a] lot of activity." (Tr. 58.)  She related that she continued to have neck pain after her surgery in 2006 and that her neck pain radiates down her spine, hands, arms, and legs. *Id.*

The plaintiff testified that she was treated for depression in 2007 and 2009, and that she was prescribed Prozac, Prilosec,[45] Celexa, Doxepin, BuSpar, and "a couple of inhalers." (Tr. 59, 63.) She related that she stopped seeing her spinal doctor "about seven days after [her] surgery . . . because [she] didn't have the money to finish paying him." (Tr. 60.)  The plaintiff testified that she is not able to work because of her inability "to hold my patience much anymore," because "[o]ne minute I'm okay, the next minute it's like everything's spinning out of control in my head," and because she has anxiety. *Id.*  She related that she was prescribed Ativan[46] for her anxiety and that when her "new doctor had took [her] off it. . . . [e]verything started kind of getting a little bit worse, and that's when [she] went in the hospital." (Tr. 61.)  The plaintiff testified that she did not receive treatment in 2007 or 2008 for her mental illness because she thought she "could take care of things on [her] own instead of having been medicated." (Tr. 62.)

---

[45] Prilosec is prescribed for ulcers, GERD , and other gastroesophageal disorders. Saunders at 580.

[46] Ativan is anti-anxiety medication. Saunders at 68.

The plaintiff then testified that, when she bends over or stands up, she feels pinching in her neck; that, when she "move[s] certain ways," she feels sharp cramps in the center of her spine; that bending, stooping, and "the heat and the cold" affect her muscles; that she is not able to sit for extended periods of time because it hurts her neck; and that she has taken Advil and Tylenol PM "to help relax her muscles." (Tr. 63-64.) She related that she experienced sleeping problems, i.e. "sleep apnea or something," that she responded poorly to treatment by a breathing machine, and that her lack of sleep affects her ability to work. (Tr. 65.)

The VE, consistent with the Dictionary of Occupational Titles, classified the plaintiff's past relevant work as an auto detailer as medium and unskilled. (Tr. 66.) The ALJ asked the VE to consider what work the plaintiff could perform if she were limited to sedentary and light work with no repetitive pushing, pulling, kneeling, or crawling; with occasional stooping or crouching; with no exposure to moving mechanical parts, electrical shocks, high places, noxious fumes or odors; with no complex work; and with only occasional contact with the public and with co-workers. (Tr. 67.) The VE answered that the plaintiff could not perform her past relevant work but concluded that she could perform unskilled and light work as an information clerk, a building cleaner, a maid or housekeeper, or a grounds maintenance worker. *Id.* He also determined that she could perform work at the sedentary level as a non-production laborer, hand packager, or truck salesman route helper. (Tr. 67-68.)

The VE testified that a person who is unable to work eight hours per day for five days per week and who could not function at "acceptable levels, six out of eight hours a day, one to two times a week" or who missed three days or more of work per month would be precluded from being able

to work. (Tr. 68.)  He also testified that "[b]ased on the Claimant's testimony on the severity [] of

[her] pain and the mental issues," she would be precluded from working. *Id.*

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on July 8, 2009. (Tr. 11-22.)  Based on the record,

the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2007.

2.  The claimant has not engaged in substantial gainful activity since February 28, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: spine disorder and depression (20 CFR 404.1520(c) and 416.920(c)).

\* \* \*

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

\* \* \*

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 414.1567(b) and 416.967(b) except no repetitive pushing or pulling in the upper or lower extremities; no more than occasional stooping or crouching; no kneeling or crawling; no exposure to moving mechanical parts, electric shocks, or high places; no noxious fumes or odors; no complex work; no more than occasional contact with the public or with coworkers.

\* \* \*

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

7.    The claimant was born on March 10, 1966, and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

* * *

11.    The claimant has not been under a disability, as defined in the Social Security Act, since February 28, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-21.)

## IV. DISCUSSION

**A. Standard of Review**

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial

evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc.*

*Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. Sept. 24, 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or

result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing his past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past

relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five-Step Inquiry

In this case, the ALJ decided the plaintiff's claim at step five of the five step process. (Tr. 11-22.)  At step one, the ALJ found that the plaintiff demonstrated that she had not engaged in substantial gainful activity since February 28, 2006, the alleged onset date of disability. (Tr. 13.) At step two, the ALJ determined that the plaintiff's spine disorder and depression were severe impairments. (Tr. 14.)  At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. (Tr. 15.)  At step four, the ALJ determined that the plaintiff had an RFC to perform light work that does not require her to kneel; to crawl; to repeatedly push/pull with her upper or lower extremities; or to be exposed to moving mechanical parts, to electric shock, to high places, to noxious fumes or odors, or to complex work; and allows only occasional stooping, crouching, and contact with the public or with coworkers. (Tr. 17.)  The ALJ concluded that the

plaintiff could not perform her past work as an auto detailer. *Id.* At step five, the ALJ concluded that the plaintiff's RFC allowed her to perform work as a building cleaner, maid, grounds maintenance worker, non-production laborer, hand packager, and truck route sales helper. (Tr. 21.)

### C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in discounting Ms. Severino's mental Medical Source Statement, failed to properly evaluate her subjective complaints of pain, and erred in assessing her lack of mental health treatment. Docket Entry No. 12-1, at 8-10, 11-12. She also argues that the ALJ did not properly consider her obesity, "failed to properly follow the VE's testimony," and erred in concluding that she had the RFC "to perform a limited range of light work." Docket Entry No. 12-1, at 7-8, 10, 13.

### 1. The ALJ properly considered Ms. Severino's findings.

The plaintiff contends that the ALJ erred "by discounting the Mental MSS [Medical Source Statement] completed by a Master of Social Work, Mary Anne Severino." Docket Entry No. 12-1, at 9. According to the Regulations, there are three different medical sources who may provide evidence: nonexamining sources, nontreating sources, and treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[47] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable

---

[47] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

medical source who has examined [the claimant] but who does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations characterize "an ongoing treatment relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010) and *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The plaintiff explains that Ms. Severino "treated" the plaintiff when she "was admitted to Skyline." Docket Entry No. 12-1, at 10. It is not clear whether the plaintiff means that Ms. Severino evaluated her one time upon admission[48] or was involved in her treatment while she was

_____

[48] If Ms. Severino only evaluated the plaintiff one time upon her admission into the hospital, she would be classified as a nontreating "other source." *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite

hospitalized. There is nothing in the record to substantiate Ms. Severino's involvement or role in the plaintiff's treatment while she was hospitalized. Ms. Severino noted on the mental Medical Source Statement that the information she provided was "based on the pt's [sic] stay at Skyline." It is not clear from that notation whether Ms. Severino actually evaluated or treated the plaintiff to any extent while she was at Skyline or whether she simply reviewed the plaintiff's records from her hospitalization at Skyline. Giving the plaintiff every benefit of the doubt, however, and assuming that Ms. Severino was involved in her treatment while she was hospitalized, Ms. Severino would be classified as a treating "other source,"[49] not as an "acceptable medical source."

As the plaintiff correctly points out, "evidence may be used from 'other sources' to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." Docket Entry No. 12-1, at 9. Social Security Ruling ("SSR") 06-03p provides that

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers,

---

linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502)

[49] The Regulations define other sources as
(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).
20 C.F.R. § 404.1513(d).

have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Cruse*, 502 F.3d at 541); *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)). SSR 06-03p further clarifies the treatment of "other sources" by explaining that

[a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
• How long the source has known and how frequently the source has seen the individual;
• How consistent the opinion is with other evidence;
• The degree to which the source presents relevant evidence to support an opinion;
• How well the source explains the opinion;
• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
• Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5 (quoted in *Roberts v. Astrue*, 2009 WL 1651523, at 7 (M.D. Tenn. June 11, 2009) (Wiseman, J.). Finally, SSR 06-03p provides that

[s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, *the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.*

2006 WL 2329939, at *6 (quoted in *Boren ex rel. S.B. v. Astrue*, 2011 WL 6122953, at 13 (N.D. Ohio Nov. 22, 2011) (emphasis added). *See also Hatfield v. Astrue*, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008) ("The Sixth Circuit, however, appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight, as opposed to leaving the decision whether to explain to the ALJ's discretion.") (quoted in *Boren*, 2011 WL 6122953, at 13; and *Brandon v. Astrue*, 2010 WL 1444639, at 9 (N.D. Ohio Jan. 27, 2010)).

In this case, the ALJ assigned minimal weight to Ms. Severino's Medical Source Statement because of the medical evidence upon which Ms. Severino relied to support her findings. (Tr. 18-20.) The ALJ noted that

> [w]hile a counselor at Robertson County Medical Group opined that the claimant would have marked limitations with carrying out instructions, making judgments, and interacting appropriately with the public and co-workers, it was also noted that these statements were qualified with the statement that these limitations were based upon information from the patient's hospitalization. Therefore, while the hospitalization may have temporarily exacerbated the claimant's condition, no evidence of record indicates that the claimant retained limitations to the degree of hospitalization on a more permanent basis.
>
> * * *
>
> Although Ms. Severino is not an acceptable medical source, her opinion has been evaluated nonetheless, although less weight has been placed on it than others due to the restricted time period of hospitalization.

*Id.*

On January 21, 2009, Ms. Severino concluded that the plaintiff's ability to understand, remember and carry out simple and complex instructions; to make judgments on simple and complex work-related decisions; to interact appropriately with the public, supervisors, and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting was markedly limited. (Tr. 778-79.) However, as noted *supra* by the ALJ, Ms. Severino explained that

her evaluation was based on the plaintiff's four day "stay at Skyline." (Tr. 778.) Ms. Severino did not evaluate the plaintiff's mental health records for her entire period of disability. Thus her Medical Source Statement does not accurately reflect the plaintiff's ability to do work-related activities on a sustained basis. (Tr. 778.) Ms. Severino's Medical Source Statement only accounts for the plaintiff's mental health limitations during her four day stay at Skyline. Further, although the plaintiff was involuntarily admitted to Skyline "due to severe depression and increased stress" and Dr. Mathews diagnosed her with MDD, recurrent, severe without psychotic features, he also noted that the plaintiff "had been without medication" and that her condition stabilized after four days of treatment and she was discharged. (Tr. 773-74.) Finally, Dr. Doineau and Dr. Yarbrough, both consultative DDS psychologists, completed mental health evaluations and determined that the plaintiff's mental limitations only mildly affected her ability to understand and remember, to perform activities of daily living, and to maintain social functioning, concentration, persistence, or pace. (Tr. 636-37, 649.)

In sum, the limitations that Ms. Severino assigned to the plaintiff in her Medical Source Statement did not accurately reflect the plaintiff's mental limitations since Ms. Severino relied only on the plaintiff's four day "stay at Skyline" and did not review her mental health records from her entire period of alleged disability. Therefore, the ALJ did not err in assigning minimal weight to her Medical Source Statement. He also complied with SSR 06-03p, 2006 WL 2329939, at *4-5, by focusing on the factor of supportability and there is substantial evidence in the record to support his determination.

**2. The ALJ properly evaluated the plaintiff's subjective complaints under SSA Ruling 96-7p.**

The plaintiff argues that the ALJ erred in evaluating the credibility of her subjective complaints of pain. Docket Entry No. 12, at 11-12. Specifically, the plaintiff contends that the ALJ failed to comply with SSR 96-7p because he "merely stated that he used the criteria outlined in SSR 96-7p in reaching his decision, rather than specifically stating the weight he gave to the claimant's statements and the reasons for that weight." Docket Entry No. 12-1, at 12. The ALJ found that

> [t]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> In terms of the claimant's alleged physical limitations, the undersigned does not find that the claimant's limitations are as severe as the claimant reports. The claimant's greatest limiting factor appears to be pain. While consideration has been given to the possible impact of the claimant's impairments and any related symptoms, including pain, in determining the claimant's residual functional capacity, the objective medical evidence, medical history, and nonmedical evidence, including the undersigned's observation of the claimant, do not support the inability to perform any work activity or activities of daily living. While the claimant has undergone cervical surgery, her treating neurosurgeon indicated that the claimant's post operative physical exam showed good sensory perception of vibration and thermal modalities C4 to T1 with good tone, mass, and strength in the corresponding levels. Additionally, as of July 26, 2006, Dr. Zellem indicated that the claimant could resume normal activity, allowing her to return to any employment.
>
> Moreover, while the claimant testified that her neck pain is now worse than before the surgery, she has not seen Dr. Zellem again for her cervical or other complaints. No other physician has recommended significant pain management treatment or surgery for the claimant's conditions. Her more recent treatment at Northcrest Medical Center indicates she presented with chief complaints of headaches. On November 8, 2008, the claimant was discharged immediately after receiving a pain injection per physician order. However, a CT of the head was normal. While the undersigned finds it reasonable to place some work limitations on the claimant because of her spine disorder, no other objective medical evidence supports any more restrictions than the undersigned has assessed.

(Tr.18) (internal citations omitted.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the [plaintiff], while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529, 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[50] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The ALJ acknowledged that there is objective medical evidence of the plaintiff's medically determinable impairments, satisfying the first prong of the *Duncan* test. (Tr. 18.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Besides reviewing medical records to

---

[50] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 404.929(c)(3).[51]

In making his credibility determination, the ALJ relied on medical records from examining and nonexamining sources and on objective diagnostic testing. (Tr. 18.) First, after the plaintiff underwent ACDF surgery in June of 2006, an x-ray indicated that the metallic plate used in the surgery was "in good position with satisfactory alignment" and Dr. Zellem, her treating neurosurgeon, opined that she was "doing very well," that she could "resume normal activity," and that she could "return to any employment." (Tr. 18, 589, 597.) Next, although the plaintiff testified that, after her ACDF surgery, she continued to have neck pain after her ACDF surgery that radiated down her spine, hands, and arms, and legs, the MRI of her cervical spine revealed only "some degenerative change at the adjacent disk level," the MRI of her thoracic spine appeared to show "mild loss of height of . . . T8 and T9," and the MRI of her lumbosacral spine was normal. (Tr. 768-70.)

Between February of 2007, and January of 2009, the plaintiff did not seek specific treatment for neck or spinal pain, although she presented to RCMG, Northcrest, and Dr. Byrd with complaints of headaches, rib pain, and generalized pain. (Tr.696-701, 705-19, 752-54, 759.) She was diagnosed with migraines and fibromyalgia (*id*), but a CT scan of her head revealed "[n]o evidence of acute

---

[51] The seven factors under 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms.

intracranial abnormality" (tr. 721) and Dr. Byrd, a rheumatologist, opined that the plaintiff had "some myofascial pain [] but it is a bit scattered and has more myofascial spasm," that she had a "moderately depressed affect" (tr. 699), and that she "certainly could have some component of fibromyalgia," but that he must also "consider[] whether she has some underlying degenerative disk disease or perhaps even a mild inflammatory disorder such as Sjogren's syndrome." (Tr. 696.) X-rays of the plaintiff's lumbar spine revealed "[n]o fracture or subluxation injury" and that the sacroiliac joint was intact. (Tr. 701.)

Finally, on August 22, 2006, the plaintiff related to Dr. Doineau that she was able to "straighten up the kitchen," do laundry, load the dishwasher, sweep and mop the floors, go to yard sales, occasionally cook, and do "most of the chores with her husband." (Tr. 636.) The plaintiff argues that the ALJ "erred in detracting from [her] credibility based on the fact that she has been able to perform some activity on a very minimal basis." Docket Entry No. 12-1, at 12. She relies on *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967), as supporting authority because the Sixth Circuit Court of Appeals held that "[t]he fact that appellant can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this appellant possesses an ability to engage in substantial gainful activity." *Id.*

The Court in *Walston* concluded that the ALJ relied too heavily on the plaintiff's activities of daily living in assessing the plaintiff's subjective complaints of pain because his subjective complaints of pain were "confirmed by every doctor who examined him." *Walston*, 381 F.2d at 586. However, in this case, the ALJ's reliance, in part, on the plaintiff's activities of daily living was not undercut by the findings of either examining or nonexamining physicians. Dr. Zellem opined that the plaintiff was "doing very well," that she could "resume normal activity," and that she could

"return to any employment" (tr. 589), and Dr. Lester and Dr. Downey both found that she could lift/carry 20 pounds occasionally and 10 pounds frequently, that she could stand/walk and sit about six hours, and that her ability to push/pull was unlimited. (Tr. 654, 686.)

In sum, medical records from the plaintiff's examining and nonexamining sources and her objective diagnostic testing demonstrate that her physical impairments cause her a certain amount of pain, but that same record medical evidence does not support the plaintiff's subjective complaints that her pain is disabling. Thus, there is substantial evidence in the record to support the ALJ's finding that the plaintiff's spinal impairment is not disabling.

### 3. The ALJ did not err in considering the plaintiff's lack of mental health treatment during her alleged period of disability.

The plaintiff contends that the ALJ "failed to consider [her] indigency and erred by drawing negative inferences about [her] conditions due to [her] lack of treatment." Docket Entry No. 12-1, at 8. The ALJ found that "other than the three day hospitalization in January 2009, the claimant has had very little mental health treatment since her alleged onset date." (Tr. 18) The plaintiff argues that his conclusion was erroneous because her "un-contradicted testimony clearly established that she could not afford treatment," Docket Entry No. 12-1, at 8, and in support, the plaintiff relies on *Stennett v. Comm'r of Soc. Sec.*, 476 F. Supp.2d 665, 673 (E.D. Mich. 2007) (citing SSR 96-7p, 1996 WL 374186, at *7-8) ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

The plaintiff mischaracterizes the ALJ's depiction of her mental health treatment. While the ALJ did note that the plaintiff had minimal mental health treatment, "[o]ther than [a] three day hospitalization in January 2009," his analysis of her mental health treatment was not limited to that single statement. The ALJ found that

> In addition, the undersigned has examined evidence of record which occurred before the alleged onset date for a longitudinal history of the claimant's condition. The undersigned notes that the claimant has had complaints of depression before the alleged onset and was prescribed medications such as Amitriptyline and Valium as of July 21, 2004, suggesting the claimant was able to perform work activities even with her complaints of depression. While a counselor at Robertson County Medical Group opined that the claimant would have marked limitations with carrying out instructions, making judgments, and interacting appropriately with the public and co-workers, it was also noted that these statements were qualified with the statement that these limitations were based upon information from the patient's hospitalization. Therefore, while the hospitalization may have temporarily exacerbated the claimant's condition,[52] no evidence of record indicates that the claimant retained limitations to the degree of hospitalization on a more permanent basis. After consideration of the totality of the evidence, the undersigned finds that the above mental health limitations contained in the residual functional capacity is [sic] reasonable.

(Tr. 18-19.)

The plaintiff explained that she had testified that she received minimal mental health treatment because she could not afford it. Docket Entry No. 12-1, at 8. Her testimony about her inability to pay for further treatment pertained to Dr. Zellem's post-operation care and not to her mental health treatment. *Id.* The plaintiff also testified that she had not been hospitalized for a mental health impairment since 2006, and that she did not receive mental health treatment in 2007 or 2008, because she "thought [she] could take care of things on [her] own." (Tr. 62.) While the Court recognizes the difficulty in expecting an individual with a mental impairment to be cognizant

---

[52] It is unlikely that the ALJ really intended to suggest that being hospitalized exacerbated the plaintiff's condition. Rather, the Court assumes that the ALJ meant that her condition upon admission and during her hospitalization was not indicative of her condition after her hospitalization.

of that impairment and to seek out treatment for that impairment on their own, the plaintiff's explanation that she did not receive continuous treatment for her mental health impairment because she could not afford it (Docket Entry No. 12-1, at 9) is undercut by her continuous treatment and diagnostic testing for her physical impairments. (Tr. 381-549, 620-27, 667, 696-754, 764, 768-77.) In addition, it is not clear whether mental health treatment had been and continued to be available to the plaintiff at Centerstone based on her inability to pay.[53]

In sum, the ALJ did not err in evaluating the plaintiff's lack of mental health treatment during her alleged period of disability. The lack of continuous mental health treatment was only one of multiple factors that the ALJ took into account in assessing her credibility, *see McClanahan v. Astrue*, 2009 WL 1684488, *6 (M.D. Tenn. June 16, 2009), and the plaintiff's assertion that she could not afford treatment for her mental health impairment was undercut by her continued treatment for her physical impairments. Therefore, substantial evidence in the record supports the ALJ's determination that the plaintiff's mental health impairment was not disabling.

### 4. The ALJ properly considered the plaintiff's obesity.

The plaintiff argues that the ALJ erred by failing to "consider or even mention the claimant's obesity and what effect her obesity would have on her ability to work." Docket Entry No. 12, at 13. SSR 02-01p, which details the Social Security Administration's ("SSA") policy on obesity, provides that even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still

---

[53] As the plaintiff pointed out, neither the ALJ nor plaintiff's counsel asked the plaintiff any questions about her inability to afford mental health treatment or whether such treatment were available to her free of charge or at a reduced charge. *See* Docket Entry No. 12-1, at 8; Docket Entry No. 16, at 3.

consider its effects when evaluating an individual's residual functional capacity. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *1. SSR 02-01p further explains that "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment," 2000 WL 628049, at *6, but it does not offer "'any particular procedural mode of analysis for disability claimants.'" *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 442-43 (6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 412 (6th Cir. Jan. 31, 2006)).

An ALJ is allowed to use his "judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating source has not indicated a diagnosis of obesity." Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *3. Obesity is a severe impairment if "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." *Id*. at *5. As with other impairments, the plaintiff is generally charged with proving that she is disabled, and she must provide evidence that the ALJ can use to reach conclusions about her alleged medical impairments. *Cranfield v. Comm'r of Soc. Sec.*, 79 Fed. Appx. 852, 857 (6th Cir. 2003); 20 C.F.R. § 404.1512(a).

In this case, the record does not indicate that the plaintiff was diagnosed with obesity[54] (tr. 220-776) and she does not provide any evidence that her weight hindered her ability to work.

_____

[54] The plaintiff alleges that on November 20, 2009, Dr. Bruce Davis diagnosed the plaintiff with "Class 1 Obesity (body mass index > 30kg/m2)," but there is no evidence of this evaluation in the record and the plaintiff does provide a specific citation for it in the record. Docket Entry No. 12-1, at 5. As the defendant points out, Dr. Davis' evaluation was conducted over four months after the ALJ's decision and one day after the Appeals Council denied review. Therefore, it is clear that the ALJ did not have any records from Dr. Davis to review. *See* Docket Entry No. 13, at 15 n.5.

Further, when the plaintiff was asked by her attorney why she is not able to work, the plaintiff replied that she is not "able to hold her patience," gets "real tired," has anxiety (tr. 60), and has neck and spine pain. (Tr. 63-64.)  At her hearing, the plaintiff never attributed her inability to work to obesity. (Tr. 54-70.)  Since the plaintiff did not provide any evidence as to how her alleged obesity affected her work, the ALJ "was not required to give obesity any express consideration." *Bush v. Astrue*, 2011 WL 3444072, at *15 (M.D. Tenn. Aug. 8, 2011) (Nixon, J.).

### 5. The ALJ properly relied on the VE's testimony.

The plaintiff argues that the ALJ "failed to properly follow VE testimony" since the VE found that she would be precluded from sedentary work if she "could not work eight hours per day at a five day work week" and that she would be precluded from all work "based on her testimony of the severity of her pain and mental issues." Docket Entry No. 12-1, at 10.

The Regulations allow ALJs to rely on a VE at step five to determine whether a plaintiff is able to perform any work. 20 C.F.R. § 404.1560(c).  The VE's testimony, in response to an ALJ's hypothetical question, will be considered substantial evidence "'only if that hypothetical question accurately portrays [the plaintiff's] individual physical and mental impairments.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987)).  Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ is required to incorporate only those limitations that he accepts as credible. *Infantado v. Astrue*, 263 Fed. Appx. 469, 476-77 (6th Cir. 2009); *Griffeth*, 217 Fed. Appx. at 429.

In this case, the ALJ asked the VE what type of jobs the plaintiff could perform if she were limited to

> sedentary and light [work] with no repetitive pushing or pulling in the upper or lower extremities; occasionally stoop or crouch; no kneeling or crawling; no exposure to moving mechanical parts, electrical shocks, or high places; no noxious fumes or odors; no complex work; occasional contact with the public, [and] occasional contact with coworkers.

(Tr. 67.)  The VE answered that the plaintiff could work as a building cleaner, maid and housekeeper, grounds maintenance worker, non-production laborer, hand packager, or truck sales and non-driver. (Tr. 67-68.)  The ALJ then asked the VE what type of work the plaintiff could perform if she "was unable to do eight hours a day five days a week on a regular competitive basis," and the VE replied that the plaintiff would be precluded from all work. (Tr. 68.)  The plaintiff's attorney also asked the VE what type of work the plaintiff could perform if her testimony about the severity of her "pain and mental issues" was credible, and the VE answered that she would be precluded from working. *Id.*

Although the VE answered two hypothetical questions by opining that the plaintiff was precluded from working, the ALJ did not rely on those answers because neither hypothetical contained limitations that were supported by substantial evidence in the record. *See Infantado*, 263 Fed. Appx. at 476-77; *Griffeth*, 217 Fed. Appx. at 429.  First, as discussed *supra*, the ALJ found that the plaintiff's testimony was not entirely credible.  Next, there is no evidence in the record that indicates that the plaintiff would be unable to work eight hours a day for five days a week. Dr. Lester and Dr. Downey both completed physical RFC assessments and found that the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, that in an eight hour workday she could stand/walk and sit about six hours, and that her ability to push/pull was unlimited. (Tr. 653-60,

685-92.)  In sum, the ALJ did not "fail[] to properly follow VE testimony" (Docket Entry No. 12-1, at 10), but instead relied on the VE's answer to a hypothetical that was supported by substantial evidence in the record in determining the plaintiff's RFC.

Finally, the plaintiff argues that the ALJ erred in determining that she had the RFC "to perform a limited range of light work." Docket Entry No. 12-1, at 7-8.  The plaintiff supports her argument by noting that "the ALJ should have credited [Ms. Severino's] mental MSS," that the ALJ erred in rejecting the VE's testimony, and that the ALJ "should have given weight to" an April 10, 2006, RCMG treatment note that indicated "that the claimant is unable to work in a dependable manner due to pain and that the claimant was unable to perform simple activities of daily living due to pain." *Id.*

As discussed *supra*, the ALJ did not err in assigning minimal weight to Ms. Severino's Medical Source Statement and he properly relied on the VE's testimony.  Further, the April 10, 2006, RCMG treatment note shows that two of the plaintiff's complaints were that she was "unable to work in a dependable manner due to pain" and that she was "unable to perform [the] simplest of ADL's [activities of daily living] due to pain." (Tr. 394.)  The medical professional who examined the plaintiff diagnosed her with fibromyalgia and prescribed pain medication but did not provide any indication as to how her pain affected her ability to work or to perform activities of daily living. *Id.* Thus, the plaintiff misconstrued her initial complaints in the April 10, 2006, RCMG treatment note to be the findings of the examining medical professional.

The plaintiff attempts to undercut the ALJ's RFC finding that she could perform a limited range of light work by arguing that he should have credited [Ms. Severino's] mental MSS," that he erred in rejecting the VE's testimony, and that he "should have given weight to" an April 10, 2006,

RCMG treatment note (Docket Entry 12-1, at 7-8) are not supported by substantial evidence in the record.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____
JULIET GRIFFIN
United States Magistrate Judge